```
                      FILED            ENTERED
                      LODGED           RECEIVED

                      OCT 0 4 2013

                         AT BALTIMORE
                   CLERK U.S. DISTRICT COURT
                    DISTRICT OF MARYLAND
              BY                           DEPUTY
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE TRACKING OF THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 443-204-3257 | CASE NO. 13-1872-SAG<br>UNDER SEAL |
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A WARRANT AUTHORIZING THE INSTALLATION AND MONITORING OF TRACKING DEVICES IN OR ON: A 2007 CADILLAC ESCALADE, BEARING MARYLAND LICENSE PLATE 2A10439 AND VIN# 1GYFK63857R351141; | CASE NO. 13-1873<br>UNDER SEAL |

### AFFIDAVIT IN SUPPORT OF APPLICATIONS
### TO EXTEND THE USE OF TWO TRACKING WARRANTS

I, Robert Blanchard, being duly sworn, hereby depose and state as follows:

#### INTRODUCTION AND AGENT BACKGROUND

1.  (a)  I make this affidavit in support of applications to extend the use of two tracker warrants. (A) It is an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c) (1) (A) for information about the location of the cellular telephone assigned call number **443-204-3257** (**TARGET TELEPHONE**), whose service provider is AT&T, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, FL, 33408. The **TARGET TELEPHONE** is a phone subscribed to George FRINK, 2 Phoebe Ct, Randallstown, Maryland, and utilized by George FRINK (FRINK). The application and this affidavit are submitted pursuant to Title 18, United States Code, Sections 2703(c)(1)(A) and (d), and 3117, and 28 U.S.C. Section 1651(a) (All Writs Act), and Rule 41 of the Federal Rules of Criminal Procedure. The **TARGET TELEPHONE** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B. (B) This affidavit is also submitted in support of an application

1

for authorization for the installation and monitoring of a vehicle tracking device. Based upon the facts set forth below, I submit that there is probable cause to believe that

> **A 2007 Cadillac Escalade displaying Maryland license plate 2A10439, Vin# 1GYFK63857R351141, registered to GSF ENTERPRISES, 11711 Reisterstown Road, Reisterstown, MD,**

(the "Escalade" or the "Subject Vehicle") is presently being used in furtherance of violations of Title 21 United States Code Sections 841 and 846, to wit; possession with the intent to distribute controlled substances and conspiracy to commit that same offense. Further, I submit that there is probable cause to believe that the installation of a tracking device in or on the Subject Vehicle, and use of the tracking device, will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

(b) On August 8, 2013, the Honorable Stephanie A. Gallagher issued the two tracker orders captioned above, and for which this affidavit and these applications seek extension.

2. I have been employed as a Special Agent with the DEA since June of 2006. Since becoming an employee of DEA I have participated in numerous investigations regarding the Controlled Substances Act. I have participated in the recovery of substantial quantities of narcotics, paraphernalia, and financial proceeds related to drug activity. I have also participated in numerous surveillance operations of Title 21 U.S.C. violators. I have participated in Title III operations, comprising of surveillance operations, monitoring wire interceptions, and analyzing telephone records. Through my training and experience I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the method of payment for such drugs. Prior to employment with the DEA I was employed for approximately six years as a Police Officer with the Manchester Police Department and for five years as a Police Officer with the Raleigh Police Department.

3. Your Affiant is aware that drug traffickers often utilize several locations to store narcotics and narcotics proceeds and use counter surveillance when driving to detect law enforcement. In

your Affiant's experience, drug traffickers also use cellular telephones, residential telephones, addresses and vehicles that are not subscribed to their own names to avoid detection by law enforcement. In your Affiant's experience, the use of GPS tracking equipment has enabled law enforcement to locate areas used to store narcotics and narcotics proceeds, that otherwise might not have been discovered.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested order and does not set forth all of my knowledge about this matter. Your Affiant has been involved with multiple investigations in which law enforcement has accessed latitude and longitude information of a cellular telephone from a telecommunications carrier. Your Affiant has utilized such data during the course of multiple investigations. Generally, pursuant to a lawful judicial order from a competent court, your Affiant has received from the carrier latitude and longitude information, also commonly known as Geo-location Information, "E-911," or "GPS data."

5. The typical process for AT&T Corporation mobile telephones is described below. Once members of law enforcement obtain a judicial order, members of law enforcement arrange to receive from the carrier periodic updates of the cellular telephone; provided that the telephone in question is "on" and in sufficient range. If GPS data is available, it is sent via an email or text message to a designated law enforcement email address or mobile device. If GPS data is not available, an email or text message will be sent with no data. The information also may be obtained through a website that must be accessed by a designated law enforcement computer. The data can be sent as frequently as every fifteen minutes, although it also can be sent less frequently, such as hourly. The email contains the date and time, as well as the approximate corresponding coordinates of the telephone. If one clicks on the coordinates, one will be linked to a Google Map of the location. If a law enforcement agent is working in the field, the law enforcement agent can receive this information on a Blackberry wireless handheld

3

device. If law enforcement is not receiving the automatic notification, or if law enforcement seeks to obtain the telephone's coordinates at a specific time, law enforcement agents can manually "ping" the telephone and, if it is activated and in range, law enforcement agents can acquire the telephone's coordinates. However, law enforcement agents need to be at the aforementioned designated computer with an internet connection in order to perform the manual "ping," which presents problems in the late evening or early morning hours when narcotics traffickers are often working and when law enforcement agents may only have access to a Blackberry wireless handheld device rather than the aforementioned designated computer. In addition, a manual "ping" can be used only every five minutes.

      6.    The email sent by the carrier includes a number in parentheses that gives the possible variance between the location where the telephone is "pinging" and the actual location of the telephone. The variance is typically provided in meters. Variances are often as low as five (5) meters. Typically, the provided variance is a distance greater than five meters, and in some instances can be significantly larger. For example, at times when cellular telephone reception is poor, the carrier often only can provide the location of a cell tower, which could represent a variance of meters or miles.

Based on the facts set forth in this affidavit, there is probable cause to believe that the following violations are being committed: (a) conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846; (b) possession with intent to distribute and distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); in violation of Title 21, United States Code, Section 843(b); (f) money laundering and conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957 (hereinafter referred to as "Target Offenses") by George FRINK. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

4

**PROBABLE CAUSE**

8. In October and November 2010, DEA agents interviewed a cooperating defendant who provided information regarding the drug trafficking activities of George Sylvester FRINK. The cooperating defendant ("CS1") stated that CS1 had been obtaining kilogram quantities of cocaine, since 2007, from an individual known as Paul ALEXANDER. CS1 identified one of ALEXANDER'S cocaine sources as Charles RANSOM. CS1 stated that RANSOM is originally from Baltimore but moved to California several years ago, and that RANSOM was a cocaine distributor who shipped kilograms of cocaine via FedEx delivery.

9. Your affiant knows that RANSOM was indicted in November 2010 in the Central District of California and charged with Participation in a Conspiracy to Distribute Cocaine in violation of 21 USC Section 846. RANSOM was a fugitive until March 2013, when he was arrested in California. According to the case agent, RANSOM was a member of a cocaine organization that was transporting hundreds of kilograms of cocaine from California to Maryland from 2008 through 2010.

10. CS1 stated that CS1 routinely got kilograms of cocaine from ALEXANDER at a bar called "On the Rocks" on Liberty Road in Randallstown, Maryland. CS1 stated that CS1 sold the cocaine for cash and that some of this cash then was paid to ALEXANDER at the same Liberty Road bar. CS1 stated that ALEXANDER had a cocaine partner named George FRINKS, and that FRINKS would be with ALEXANDER at the meetings at On The Rocks Bar. According to CS1, FRINKS had a financial interest in the bar.

11. Maryland Department of Assessments and Taxation (MDAT) records indicate that on November 18, 2009, a trade name application was filed and approved for the trade name ON THE ROXX. The business is listed with an address of 9036 Liberty Road, Randallstown, MD, and the records identify George FRINK as the "president owner."

12. In February 2011, Agents interviewed a Cooperating Source, hereafter referred to as CS2, regarding a Drug Trafficking Organization (DTO) that was transporting hundreds of kilograms of cocaine per month from California to Maryland. CS2 identified the leader of the California based DTO as Heriberto "Eddie" LOPEZ, aka Big Dog (hereinafter referred to as LOPEZ). CS2 also identified Ricky BRASCOM as a California based cocaine distributor to whom LOPEZ supplied kilograms of cocaine.

13. CS2 identified Charles Dwight RANSOM as a cocaine distributor from Maryland who was living in California and was a member of the LOPEZ-BRASCOM DTO. CS2 also identified Maryland businessman Gerald Lamont JONES as a close associate of RANSOM. CS2 had introduced RANSOM to LOPEZ in 2008 for the purpose of providing RANSOM with a source of supply for cocaine. A short time after this introduction, JONES flew out to California and RANSOM introduced JONES to LOPEZ. CS2 stated that at the time of this introduction, RANSOM described JONES to CS2 as RANSOM's partner in the cocaine distribution business. According to CS2, JONES is the owner of PIMLICO MOTORS in Baltimore, MD; as well as the owner of Gold's Gym in Owings Mills, MD and the owner of a construction company.

14. According to CS2, from 2008 through October 2010, the LOPEZ-BRASCOM DTO shipped hundreds of kilograms of cocaine from California to Maryland for subsequent distribution by JONES and others. In 2008, RANSOM and JONES initially provided LOPEZ and BRASCOM with vehicles that had concealed compartments to be utilized to secrete cocaine and money. CS2 stated that BRASCOM would load the vehicles with cocaine, and then BRASCOM and LOPEZ would load them on tractor-trailer auto-carriers that were destined for Baltimore, Maryland. CS2 stated that BRASCOM and LOPEZ would place multiple vehicles containing cocaine on each car carrier; and that each car carrier would have 50 to 120 kilograms of cocaine on them. Once the cocaine was distributed in Maryland, the money from the cocaine sales would then be secreted in the cars and shipped back to California for the

vehicles to be used again to transport cocaine to Maryland. The people driving the auto transport trailers worked for RANSOM.

15. CS2 stated that in 2009, the CS2 began traveling to Baltimore to assist in the distribution of the cocaine that was shipped from California. CS2 met JONES' car carriers on three occasions, and helped drive the cars containing the cocaine to a townhouse in Owings Mills, Maryland. CS2 stated that he was aware of approximately 10 shipments of cocaine that were delivered from California to JONES via car carrier tractor-trailers. According to CS2, in May 2009, a Honda Ridgeline was being transported on an auto transport trailer from California to Pimlico Motors located on Liberty Road in Baltimore, Maryland. The trailer was stopped by law enforcement and cocaine was seized. The LOPEZ DTO then stopped using the auto transport trailers to transport the cocaine to Maryland.

16. According to CS2, after the seizure, the DTO changed the transportation method used to smuggle the cocaine from California to Maryland. The cocaine was secreted within legitimate tractor trailer cargo traveling from California to Maryland. CS2 estimated that this method was used two times a month for a year. The DTO usually shipped 50 to 120 kilograms at a time. CS2 stated that of these shipments, at least one of the shipments sent to JONES was 200 kilograms of cocaine; and there was also a shipment to JONES of 150 kilograms of cocaine using this method. They used this tractor trailer method until approximately February 2010.

17. CS2 stated that in 2009, BRASCOM started meeting the cargo trucks in Baltimore, and then distributing the smuggled shipments of cocaine that were contained within the cargo. A large amount of the cocaine was delivered by BRASCOM to JONES, while other amounts were distributed by BRASCOM to customers in Pennsylvania, New Jersey, and Virginia who were not associated with JONES. Typically, there would be 50 to 60 kilograms of cocaine that went to JONES. CS2 estimated that there were 24 shipments made via the cargo trucks. CS2 stated that JONES or one of

JONES' couriers usually picked the cocaine up from BRASCOM at a hotel (usually the Hyatt Place, Owings Mills, Maryland).

18. CS2 stated that, on approximately five occasions, CS2 took cocaine to JONES at a townhouse. On several of these trips, CS2 saw JONES and his right hand man, whom CS2 knew as "George" or "G," counting large quantities of money inside the townhouse. CS2 also stated that he saw couriers dropping off money to JONES at the townhouse. CS2 identified George Sylvester FRINK from FRINK'S Maryland driver's license photograph as "George" or "G".

19. According to CS2, in 2009, BRASCOM became worried that the townhouse JONES was using as a stash house in Owings Mills, MD, would be detected by law enforcement. BRASCOM told JONES to find a new stash house.

20. CS2 stated that JONES then started using 11711 Reisterstown Road, Reisterstown, Maryland, as the new stash house. CS2 stated that both BRASCOM and JONES had keys to this location. CS2 stated that from then on, the DTO used 11711 Reisterstown Road as a stash location for the cocaine that was shipped to Maryland, and to store the cash proceeds from the cocaine sales. MDAT records indicate that 11711 is owned by an LLC that is owned by JONES.

21. Your affiant knows that Ricky BRASCOM, Heriberto "Eddie" LOPEZ, and Charles RANSOM, and others were indicted in the Central District of California in November 2010, for federal cocaine trafficking charges. BRASCOM was arrested and convicted, while LOPEZ and RANSOM fled from law enforcement and became fugitives. RANSOM was arrested in March, 2013, and LOPEZ is still at large.

22. In early June 2013, Agents conducted a drive-by surveillance of 11711 Reisterstown Road and they saw a van parked in front of the building. The van had the words "Pimlico Motors" painted on the side. An unidentified male got out of the van and appeared to be waiting for someone. Agents noticed that the door of the attached garage had been raised, and a white Chevrolet

SUV was moving slowly out of the garage. The vehicle stopped in the driveway and FRINK got out of the driver's side.

23. FRINK met with the unidentified driver of the Pimlico Motors van, and then both men opened the rear passenger doors and tailgate of the white Chevrolet SUV. Periodically, both men would lean into the rear passenger area of both sides of the white SUV. They would also lean into the rear of the SUV; and occasionally retrieve unidentified objects from the PIMLICO MOTORS van.

24. After approximately thirty minutes of continuing activity by FRINK and the unknown male at or in the rear of the Chevrolet SUV, Agents observed FRINK enter a black Cadillac Escalade and drive out of the area. Surveillance of 11711 Reisterstown Road continued as the unidentified man continued to go in and out of the garage and various areas of the rear of the white Chevrolet SUV. Based on my training and experience, I believe that the two men were removing packages of drugs that were concealed in the SUV. The unidentified male subsequently drove away in the Pimlico Motors van, bearing Maryland interchangeable auto dealer plate, 2A08768, registered to Rami Bros. Inc., 5304 Park Heights Avenue, Baltimore. MDAT corporate records show that Rami Bros. Inc is an active Maryland corporation owned by Gerald Lamont Jones, utilizing the trade name Pimlico Motors.

25. Surveillance of the white Chevrolet SUV continued, and at approximately 4:18 pm on the same day, Agents saw FRINK return to 11711 Reisterstown Road. Agents saw FRINK enter the white SUV and back it into the garage and close the garage door. A short time later, Agents saw FRINK walk from 11711 Reisterstown Road while carrying a backpack in each hand. Each backpack appeared to be heavily weighted, with rectangular shapes protruding on the exterior of one of the bags. Based on my training and experience, I recognized the rectangular shapes to be the same size and shape as kilogram packages of cocaine or heroin.

26. FRINK got into the Cadillac Escalade and drove away from the area. FRINK stopped at 8 Church Lane in Pikesville, Maryland, left and then returned to 8 Church Lane. There FRINK met with a man driving a black truck with a short cargo bed bearing another Maryland interchangeable auto dealer's tag.

27. About 90 minutes later, a Baltimore County Police uniformed officer conducted a traffic stop of FRINK's Cadillac Escalade, operated by FRINK. A subsequent canine scan of the vehicle by a Baltimore County Police drug detector dog resulted in a positive alert for controlled substances. The vehicle was searched and the backpacks that FRINK took out of 11711 Reisterstown Road were not in the vehicle. During the search, Officers observed five cellular phones, approximately $4,000 US currency, and a number of bank deposit receipts in the vehicle. The receipts showed more than $32,000 in cash deposits made to three different bank accounts in a four day period just about a week earlier. Based on my training and experience, I know that drug traffickers often use several cell phones at the same time and limit contacts with specific persons to a specific phone. The stopped vehicle was **a 2007 Cadillac Escalade displaying Maryland license plate 2A10439, Vin# 1GYFK63857R351141, registered to GSF ENTERPRISES, 11711 Reisterstown Road, Reisterstown, MD.**

28. On July 1, 2013, video surveillance of the rear parking lot of 8 Church Lane, Pikesville, MD was conducted via a covert video camera. The video images captured show a gray colored Mercedes Benz minivan enter the parking lot at approximately 3:47 pm. A subject later identified as Albert GRIFFIN got out of the minivan and walked toward the front of the building out of view. The next day, July 2, 2013, video surveillance was again conducted on 8 Church Lane. During this surveillance, at approximately 12:50 pm, JONES parked a Range Rover SUV in the rear of the building and entered 8 Church Lane. Later that afternoon, Agents saw JONES reposition the Range Rover further back in the rear of the lot; and then repositioned the Mercedes minivan so that the rear of the minivan was next to the rear of the Range Rover.

29. Agents monitored the camera as JONES appeared to remove several unidentifiable objects from the rear cargo area of the Range Rover, and placed them into the rear cargo area of the minivan. Approximately five minutes after transferring objects from the Range Rover to the minivan, Agents observed a gray colored Mercedes sedan enter the rear parking lot of 8 Church Lane.

30. GRIFFIN got out of the Mercedes sedan and shook hands with JONES on the parking lot. After a brief conversation, GRIFFIN entered the Mercedes minivan and drove away. The Mercedes minivan was bearing a Maryland interchangeable auto dealer license plate number 2A19455. A registration check revealed the license plate is registered to Keswick Auto Repair LLC. Based on the BDO investigation, Keswick Auto Repair LLC is a business linked to JONES

31. Three days later, on July 11, 2013, video surveillance monitored by Agents showed JONES park the same Range Rover at the rear of the lot of 8 Church Lane. JONES then repositioned the same Mercedes minivan adjacent to the Range Rover, so as to cause the rear cargo areas to be next to each other. JONES opened the rear cargo door of both vehicles and removed a duffel bag from the Range Rover and set it on the ground between the vehicles. A female walked out of 8 Church Lane, picked up the duffel bag, and carried it with her back into the building. As the surveillance continued, it appeared that JONES moved other unidentified objects from the Range Rover to the rear cargo area of the minivan. While JONES was transferring the objects into the minivan, GRIFFIN arrived and placed a duffel bag into the minivan.

32. Shortly thereafter, GRIFFIN entered the minivan and drove it out of the area. Based on my training and experience and the totality of the circumstances mentioned above, I believe that JONES arrived at 8 Church Lane with a number of bags containing drug proceeds that he was sending with GRIFFIN to take to the source of their cocaine.

33. On July 16, 2013, Agents observed GRIFFIN arrive at 8 Church Lane, operating silver Mercedes Benz R350 displaying Maryland interchangeable dealership license plate 2A19455.

While monitoring electronic surveillance, BDO Agents observed GRIFFIN open the hatch of the R350 and remove a large dark colored duffel bag from the rear of the vehicle and place it on the ground.

34. GRIFFIN then retrieved another duffel bag from the rear of the vehicle and placed it on the edge of the trunk of the R350. Agents observed GRIFFIN repeatedly reached down into what appeared to be the spare tire well and removed multiple unknown objects, which he placed inside of the second duffel bag. When complete, GRIFFIN placed the bag back into the trunk of the vehicle, secured the vehicle, and left the area in another vehicle.

35. On July 22, 2013, a court authorized GPS tracking device on the R350 revealed that the vehicle had left Pikesville, Maryland at approximately 3:00 A.M. The vehicle drove south down to the Myrtle Beach area in South Carolina where it remained for approximately one hour before it left driving westbound.

36. On July 24, 2013, BDO Agents contacted agents at the Ventura Resident Office (VRO) and informed the Agents that the R350 was currently near Flagstaff, Arizona and appeared to be driving towards California. VRO Agents monitored the GPS tracking device and observed the R350 arrive at the Embassy Suites Hotel in Palmdale, California.

37. On July 25, 2013, VRO Agents positively identified GRIFFIN based on pictures supplied by BDO Agents as he exited the Embassy Suites Hotel carrying a black duffel bag in his left hand. VRO Agents observed GRIFFIN open the rear passenger door of the R350 and placed the black duffel bag behind the seats in the trunk cargo area. Shortly thereafter, GRIFFIN returned into the hotel. VRO Agents later observed GRIFFIN exit the hotel, enter the R350, and leave the hotel parking lot.

38. VRO Agents conducted surveillance of GRIFFIN to a strip mall. VRO Agents observed GRIFFIN exited the R350 and enter a Starbucks coffee shop. VRO Agents maintained surveillance of GRIFFIN inside the Starbucks and observed GRIFFIN meet with a Hispanic female inside. VRO Agents observed GRIFFIN depart with the Hispanic female in a Toyota RAV4 with a

California license plate. VRO Agents continued surveillance of the RAV4 to Los Angeles International Airport, where GRIFFIN exited the vehicle in front of the ticketing/departing flights area. Surveillance was terminated on GRIFFIN and the RAV4 but continuously maintained on the R350.

39. VRO Agents maintained surveillance of the R350 as they obtained a search warrant for the vehicle. Agents searched the R350 and found $1,076,735 in U.S. currency contained within two duffel bags. VRO Agents seized the money, and the R350 was towed to an impound lot. According to VRO agents, a representative of Keswick subsequently claimed the R350, but made no inquiry or complaint about any missing contents of the vehicle.

40. Toll analysis conducted on the **TARGET PHONE** revealed 23 calls to 443-756-9669, subscribed to JBL Construction, from April 30 to July 11, 2013. JBL Construction is owned by JONES.

41. Toll analysis conducted on the **TARGET PHONE** revealed five calls to 443-204-2582, subscribed to JBL Construction, on April 29-30, 2013. JBL Construction is owned by JONES.

42. Toll analysis conducted on the **TARGET PHONE** revealed four calls to 410-664-8364, subscribed to Pimlico Motors, on May 3 to May 6, 2013. Pimlico Motors is owned by JONES.

43. As is set forth above, CS-1 has met and has identified FRINK as a cocaine source of supply, and CS1 has received cocaine that was provided by FRINK. Also, shortly after FRINK was seen removing objects from the White SUV in June and putting two heavy backpacks in his Escalade, a drug detection dog alerted to the vehicle during a traffic stop. Also, bank records indicate that FRINK's credit card was used in California in late July, during the period when GRIFFIN was seen in California and the money was found in the R350 Mercedes. Based on the foregoing, I submit that there is probable cause to believe that FRINK is involved in drug trafficking. It is likely that tracking the **TARGET TELEPHONE** will help to identify (1) the places that FRINK travels, and (2) the individuals with whom

FRINK meets. This information would help to further identify the scope of this on-going cocaine trafficking conspiracy and its participants.

44.     In July 2013, agents obtained a warrant authorizing the installation and monitoring of a tracking device on FRINK's Escalade. Because agents could not locate the vehicle during the 10 days allowed by the warrant, the tracker was never installed. Also, agents have conducted surveillance on FRINK on numerous occasions, before and after that 10 day period, and there has been no discernible pattern to FRINK's activity.

45.     The telephone tracker, authorized on August 8th, was used to locate FRINK and the Escalade. A tracker then was placed on the Escalade on August 13th. On August 16th, the GPS tracker showed that the Escalade was parked on Luguain Court in Pikesville. Surveillance Agents, however, could not see the Escalade on the court. According to the management of The Residence of Waterstone Apartments, FRINK had leased an apartment on July 19, 2013, at 255 Luguain Court. The apartment has an attached garage, and on the lease application FRINK listed his vehicle as a black 2008 Cadillac Escalade. According to the GPS tracking device, the Escalade has not moved since August 16th; therefore, we believe that the vehicle is parked inside the garage adjacent to 255 Luguain Court.

46.     Since it was authorized on August 8th, the telephone tracker has indicated that FRINK has been at his residence at 2 Phoebe Court during the overnight hours. Based on these facts and training and experience, I believe that FRINK is still residing at 2 Phoebe Court, and he is setting up 255 Luguain Court as a stash house to store drugs and money, as he had used 11711 Reisterstown Road.

47.     On September 18th, the GPS tracker indicated that the Escalade had moved a short distance. Based on this movement, I believe that FRINK is preparing to use the Escalade again and that tracking of the vehicle should be continued. During the period when the Escalade has remained

stationary, the TARGET TELEPHONE indicated that FRINK traveled to California. Consequently, it is requested that the court extend the authorization of cellular tracking on the **TARGET TELEPHONE**.

48. In the event that the Court grants this application, there will be periodic monitoring of the TARGET TELEPHONE during both daytime and nighttime hours for a period of up to 45 days following the beginning of the extension period.

### REQUEST FOR AUTHORIZATION FOR CONTINUED USE OF GPS TRACKING DEVICES

49. Based on the foregoing, I submit that there is probable cause to believe that FRINK and his Cadillac Escalade are involved in drug distribution. It is likely that following FRINK's Cadillac Escalade will help to identify (1) the places that FRINK travels, and (2) the individuals with whom Frink meets. As is demonstrated above, the tracker has been useful in locating what might be the next stash house to be used by this drug organization.

50. Based on surveillance and tracker information, there is no discernible pattern to FRINK's activity and it is impossible to predict when an opportunity will arise to adjust or remove the tracking device. Therefore, it is requested that the court authorize maintenance and removal of the tracking device during both daytime and nighttime hours to ensure the safety of the executing officers and to avoid premature disclosure of the investigation.

51. In the event that the Court grants this application, there will be periodic monitoring of the vehicle tracking device during both daytime and nighttime hours for a period of up to 45 days following extension of the authorization to use the device. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

52. It is requested that the warrants and accompanying affidavit and application in support thereof, as they reveal an ongoing investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, and better ensure the safety of Agents and Confidential Sources, except that copies of the warrants in full or redacted form may be maintained by the United

States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to execute the warrants.

53. As is demonstrated above, CS-1 has a relationship with FRINK that would allow FRINK to identify CS-1 based on information contained in this affidavit; consequently, FRINK could intimidate and possibly harm CS-1. Also, if notified about the requested warrants, FRINK could flee from prosecution and possibly destroy or tamper with evidence. Thus, there is reasonable cause to believe that providing immediate notification of the execution of the warrants would seriously jeopardize the investigation. In accordance with 18 U.S.C. section 3103a(b) and Federal Rule of Criminal Procedure 41(f) (3), I request that the Court also authorize the delay of notification of the execution of the warrants for a period of 30 days after the end of the authorized period of tracking (including any extensions thereof).

54. Based on the above, and my training and experience, your Affiant believes that FRINK is currently utilizing the **TARGET TELEPHONE** to conduct his drug trafficking and money laundering activities, and will continue to do so for at least the next 45 days.

## REQUEST FOR A WARRANT FOR LOCATION INFORMATION

55. Based on the foregoing, your Affiant requests that the Court issue the proposed warrant for telephone location information pursuant to Rule 41 and 18 U.S.C. § 2703(c).

56. Your Affiant further requests, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrants has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to FRINK, the subscriber or user of the

**TARGET TELEPHONE**, and the user of the **SUBJECT VEHICLE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a (b) (1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a (b) (2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a (b) (2).

      57.    Your Affiant further requests that the Court direct AT&T to disclose to the government any information described in Attachment B that is within the possession, custody, or control of AT&T. Your Affiant also requests that the Court direct AT&T to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with AT&T Corporation's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on AT&T's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate AT&T for reasonable expenses incurred in furnishing such facilities or assistance.

      58.    Your Affiant further requests that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate the **TARGET TELEPHONE** outside of daytime hours.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*/s/ Robert Blanchard*
Robert Blanchard
Drug Enforcement Administration
Special Agent

Subscribed to and sworn before me on September 20, 2013.

_____
Honorable Timothy J. Sullivan
United States Magistrate Judge

## ATTACHMENT A

**Property to Be Searched**

1. The cellular telephone assigned call number **443-204-3257**, whose service provider is AT&T Corporation, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408.

2. Information about the location of the **TARGET TELEPHONE** that is within the possession, custody, or control of AT&T Corporation.

## ATTACHMENT B

**Particular Things to be Seized**

All information about the location of the **TARGET TELEPHONE** described in Attachment A for a period of FORTY-FIVE days, during all times of day and night. "Information about the location of the **TARGET TELEPHONE**" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T Corporation is required to disclose the Location Information to the government. In addition, AT&T Corporation must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T Corporation's services, including by initiating a signal to determine the location of the **TARGET TELEPHONE** on AT&T Corporation's network or with such other reference points as may be reasonably available,and at such intervals and times directed by the government. The government shall compensate AT&T Corporation for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a (b) (2).